UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRENDA ALVAREZ,

     Plaintiff,

v.                                   Case No. 8:19-cv-1044-T-33SPF

LAKELAND AREA MASS TRANSIT
DISTRICT,

     Defendant.

_____/

**ORDER**

This matter is before the Court on consideration of Defendant Lakeland Area Mass Transit District's Motion for Summary Judgment (Doc. # 60), filed on April 15, 2020. Plaintiff Brenda Alvarez responded on May 13, 2020. (Doc. # 65). For the reasons that follow, the Motion is granted.

I.   **Background**

Alvarez — a woman in her sixties who suffers from anxiety and depression — worked for the District, which operates as "Citrus Connection," as a senior financial reporting analyst beginning on May 31, 2016. (Doc. # 60-2 at 1; Doc. # 66-20 at 1, 24). She reported directly to the District's Chief Financial Officer, David Persaud. (Doc. # 60-7 at 77:13-16; Doc. # 60-2 at 1-2; Doc. # 66-20 at 1). Because Persaud had interviewed Alvarez before she was hired, he had an

1

opportunity to observe her age and gender before hiring her.
(Doc. # 60-7 at 13:17 – 24). During the job interview, one
interviewer, Mr. Satchell, told Alvarez she was "experienced
for this position and [had] the experience [the District]
need[ed]." (Id. at 17:2-7). Alvarez felt this comment
referred to her age because "experience comes with age." (Id.
at 17:8-12).

### A.   **Complaint about Persaud**

Soon after Alvarez was hired, the District's financial
manager position (also called the controller) became vacant.
(Id. at 121:7 – 14). The District's Executive Director, Tom
Phillips, encouraged Alvarez to apply for the position. (Id.
at 122:2-20, 123:24-124:8). Persaud similarly told Alvarez
that "the position was open and if [she] was interested to
apply." (Id.). For various reasons, she did not apply for the
promotion. (Id. at 122:22-25, 124:14-125:1; Doc. # 66-20 at
6). Persaud eventually promoted Rhonda Carter to the
controller position. (Doc. # 60-2 at 2).

Following Carter's promotion, Alvarez felt that Persaud
was "less receptive of" her and she began receiving emails
from him which she considered demeaning. (Doc. # 60-7 at
125:2-126:11). Phillips told Alvarez that Persaud "did not
understand why [she] was not applying for positions that would

2

promote [her]." (Id. at 124:16–125:1). Nevertheless, Alvarez testified that she attributed the harsh emails "to the simple fact that [Persaud] has an issue with women" and "doesn't like women questioning him." (Id. at 126:12–18).

On July 7, 2017, Alvarez met with Phillips to complain about Persaud's conduct. (Doc. # 60-18 at 4; Doc. # 60-3 at ¶ 4; Doc. # 60-7 at 92:13–22). Alvarez's complaint focused on Persaud's questioning why she travelled to the District's Bartow location, sending her offensive emails, and ridiculing her in staff meetings. (Doc. # 60-7 at 94:25–95:20). Alvarez attributed Persaud's conduct to her gender, Persaud's being a bully, and his disappointment that she declined to apply for the controller position. (Id. at 96:15–97:7). Alvarez described Phillips' demeaner during this meeting as "very concerned" and respectful. (Id. at 98:6–17).

Phillips assigned Steve Schaible, Director of Human Resources, to investigate Alvarez's complaints. (Doc. # 60-18 at 4; Doc. # 60-5 at ¶ 4; Doc. # 60-3 at ¶ 5). Alvarez testified that she met with Schaible soon after and Schaible's notes reflect that he met with Alvarez on July 14, 2017. (Doc. # 60-7 at 105:14 – p. 106:2; Doc. # 60-18 at 4). But, while Alvarez acknowledged in her affidavit that Schaible "did reach out to [her]" around this time, she represents that she

did not physically meet with Schaible until July 27, 2017. (Doc. # 66-20 at 15-16).

Regardless, Alvarez testified that she repeated her concerns about Persaud's conduct toward her, related Persaud's conduct to her gender, and expressed concerns regarding the accounting of grant expenses during this first meeting with Schaible. (Doc. # 60-7 at 109:24-110:9; 111:11-112:5). But, according to Schaible's notes regarding the meeting, Alvarez initially attributed Persaud's conduct to her declining to accept promotions into other positions. (Doc. # 60-18 at 5; Doc. # 60-7 at 118:15-25). After Schaible asked her whether the treatment was related to a protected characteristic, Alvarez associated Persaud's conduct toward her with her gender. (Doc. # 60-18 at 5; Doc. # 60-7 at 113:12-114:5, 115:19-25). Alvarez did not attribute Persaud's actions to her age in her complaint to Schaible. (Doc. # 60-5 at ¶ 5; Doc. # 60-18 at 4-5; Doc. # 60-7 at 117:1-12).

Alvarez complained to Schaible that Persaud acted unprofessionally by sending her emails that included other employees on the distribution. (Doc. # 60-18 at 5; Doc. # 60-7 at 113:8-11). She also complained that Persaud "humiliated, bullied, laughed at [her, and] made fun of [her] accounting knowledge" during staff meetings. (Doc. # 60-7 at 115:1 – 5;

4

Doc. # 60-18 at 5). Based on these complaints, Schaible's investigation "focused upon [] Persaud's interactions with [] Alvarez during staff meetings and his email exchanges with [] Alvarez." (Doc. # 60-5 at ¶ 6). When Schaible concluded the meeting, he requested that Alvarez advise him "if there is something she remembers or wants to add" and reminded her to provide the supporting documents she referenced during the interview. (Doc. # 60-18 at 5).

Alvarez's complaint about Persaud concerned three staff meetings in particular and fourteen emails from Persaud that Alvarez turned over to Schaible.

The first staff meeting occurred on a specified date. In her answers to interrogatories, Alvarez described Persaud's conduct during the meeting:

> [Persaud] singled me out by questioning an issue that he and I had previously discussed in his office . . . . As [Persaud] went around the table during this meeting, he brought up my observation and started laughing at me saying that the capital is reflected in fund 1 and if I knew anything about grant accounting, I would know this.

(Doc. # 60-67 at 11).

The second staff meeting occurred June 1, 2017. (Doc. # 60-7 at 182:13-183:12; Doc. # 60-31). Alvarez described the incident:

There was [a] credit balance because the journal entry wasn't made. And it crossed over years. And, so it showed up on this report. And, so [Persaud] started laughing at me, asking me what was I going to do with this journal entry; why, Ms. Alvarez, is there a credit in this expense account. Accountants know you can't have a credit in an expense account. So what are you going to do about it.

(Doc. # 60-7 at 185:12-20, 187:19-188:1; Doc. # 60-32).

The third and final relevant staff meeting took place on July 24, 2017. (Doc. # 60-18 at 7). In relevant part, Alvarez described the incident as:

[Persaud] went around the table . . . . [Persaud] comes to me . . . [and] [o]ut of the blue he says, you are [employee Elizabeth Rocha's] backup in Bartow, right[?] I said, no, not anymore. [Persaud] said, why; you are supposed to be her backup and be in Bartow. Why are you not in Bartow? I said, because of your e-mail. [Persaud] said, I did not tell you to not be in Bartow. I said, your e-mail expressed concern about me being in Bartow with the implication my time was better utilized being in Lakeland. [Persaud] said, I never told you that. I am confused. Then he asked me when I would have the T.D. financials ready. I told him I was waiting on journal entries. When Regina . . . said, she is waiting on my journal entries, [Persaud] dropped the conversation.

(Doc. # 60-7 at 216:21-218:7; Doc. # 60-38).

During his investigation, Schaible interviewed ten employees who were present at the July 24 staff meeting. (Doc. # 60-18 at 7-11). These employees confirmed that Persaud had been "stern" with Alvarez at the staff meeting, but "did not yell." (Id. at 8). Only one employee remarked that Persaud

treats women differently than men. Specifically, employee Regina Mauras told Schaible that Persaud "tends to be abrupt in group settings, especially with females and not with males." (Id. at 10). Additionally, Ms. Mauras has provided an affidavit, averring that Persaud "brutally picked on" Alvarez at this staff meeting by "rais[ing] his voice to her, and belittl[ing] her in front of the entire staff." (Doc. # 66-22 at 3). Ms. Mauras also stated that she has "seen and heard of other women being belittled and crying at the hands of [] Persaud." (Id. at 6).

Alvarez identified fourteen emails from Persaud when she complained to Schaible. For example, in one email, from November 10, 2016, Persaud wrote, among other things, "No attachment — that is not a professional way to respond to an assignment." (Doc. # 60-26). Persaud's November 18, 2016, email included the sentence "Who authorized these changes." (Doc. # 60-27). Alvarez considered the email offensive in tone. (Doc. # 60-7 at 174:24-175:2). She testified this email was significant because Persaud would tell Alvarez that she "had no . . . authorization to make [certain] changes" because Persaud was "in charge of finance and everything will go through him." (Id. at 173:12-19).

In a March 20, 2017, email, Persaud responded to Alvarez's request for additional training regarding the Trapeze computer program. (Doc. # 60-30). His response included: "It would be helpful to understand what you are requesting . . . . Given this request is financial in nature I am still not convinced [of] your motive." (Id.). Alvarez was offended that Persaud questioned her motive for wanting the training. (Doc. # 60-7 at 181:8-182:8).

On June 1, 2017, Persaud sent an email to Alvarez that included: "[There is] confusion with recording capital versus operating expenses." (Doc. # 60-31; Doc. # 60-7 at 182:9-24). Alvarez believed this email significant because it referenced the June 1 staff meeting in which she felt Persaud had humiliated her. (Doc. # 60-7 at 182:9 – 24). A few weeks later, on June 28, 2017, Persaud responded to Alvarez's email regarding why she had missed a grant meeting. (Doc. # 60-33; Doc. # 60-7 at 190:3-20). Persaud's email included, "I understood, in the future my meeting takes priority, no exceptions." (Doc. # 60-33). Alvarez testified that this email was evidence of Persaud harassing her. (Doc. # 60-7 at 190:21-191:7).

Soon after, on July 6, 2017, Persaud emailed Alvarez the following: "I am not sure why you are in Bartow so frequent.

I know you are covering for [Ms. Rocha] on the TD data, but do you have to be there[?] I am just curious because of the required travel. It would be helpful if you will communicate these matters to me in [a] respectful way." (Doc. # 60-35 at 2). Alvarez interpreted this language as Persaud instructing her not to travel to Bartow — leading to the dispute between Alvarez and Persaud during the July 24, 2017, staff meeting. (Doc. # 60-7 at 208:12-21).

Alvarez responded to this email on July 7, stating that she always informed Persaud about her trips to Bartow and requesting that Persaud "try to treat [Alvarez] with respect and professionalism, as [he] do[es] other employees." (Doc. # 60-35 at 1-2). Persaud replied: "It appears that since the office restructuring at the modular, you are very bitter with your office environment. If you seriously believe you are single[d] out and treated different[ly] then you need to address this matter in accordance with the District Human Resources policy." (Id. at 1). Alvarez believed this comment was evidence of Persaud harassing her by changing the location of her desk within her workspace to a place where "everybody could see [her]" to keep track of her. (Doc. # 60-7 at 204:12-205:10). This was the final email Alvarez identified in her complaint to Schaible.

According to Schaible's notes, he interviewed Persaud following Alvarez's initial interview. (Doc. # 60-18 at 6). Schaible's notes reflect that Persaud denied treating his female coworkers differently than male coworkers. (Id.). He allegedly asserted that "he treats everyone the same and holds them responsible for their work." (Id.). But Persaud testified that he was not interviewed by Schaible. (Doc. # 66-14 at 83:18-22).

During the investigation, Alvarez was instructed to report directly to the controller, Ms. Carter. (Doc. # 60-40 at 235:21–236:3). On August 7, 2017, Persaud reorganized the finance department, permanently placing Alvarez and three coworkers under Carter's direct supervision. (Doc. # 60-41; Doc. # 60-40 at 235:9-20). Although Alvarez did not want to report directly to Persaud anymore, she was still disappointed with the reorganization. (Id. at 236:12-237:7). She wanted to be supervised by Aaron Dunn rather than Ms. Carter. (Id.; Doc. # 60-7 at 222:9-22). Alvarez testified that working under Ms. Carter "was no different than working under [] Persaud" because Ms. Carter would do "everything that [Persaud] would tell her to do." (Doc. # 60-40 at 236:12-237:7).

After the reorganization, Alvarez stopped taking her work to Persaud, and could not recall any direct conversations or email exchanges thereafter. (Doc. # 60-40 at 310:18-24, 312:3-8). But she testified she still had unpleasant interactions with Persaud after the reorganization:

> When I would be in the same building with [Persaud], he would stare at me, he would glare at me. He knew what time I left every day. And he would stand out on the sidewalk, walking back and forth on the sidewalk. And I finally just waited until he got tired of pacing the sidewalk and waiting for me.

(Id. at 311:5-14).

Schaible concluded his investigation and found that Persaud acted unprofessionally by sending emails to Alvarez that contained unnecessary remarks and were unnecessarily circulated to other employees. (Doc. # 60-18 at 2). Thus, "Alvarez's allegations of unprofessional communication by [] Persaud [were] confirmed." (Id.). Schaible recommended that the Executive Director issue a counseling to Persaud with respect to that conduct. (Id. at 3). As a result, Persaud received a counseling on this issue on July 27, 2017. (Doc. # 60-4; Doc. # 60-3 at ¶ 6).

But Schaible did not confirm Alvarez's complaint that Persaud bullied her or discriminated against her because of her gender. (Doc. # 60-18 at 2). As Alvarez had not complained

of any alleged age discrimination to Schaible, his investigation made no finding regarding age discrimination. (Id. at 2; Doc. # 60-5 at ¶ 8).

Alvarez was deeply disappointed in how Schaible treated her and conducted the investigation. She averred that Schaible ran the interview with her "like an interrogation." (Doc. # 66-20 at 15). Alvarez was afraid of and intimidated by Schaible. (Id.). According to Alvarez, she "was especially frightened when [] Schaible came to [her] desk, demanding [she] report to him, standing over [her] military fashion with arms folded across his chest, feet apart and extremely close to [her]." (Id. at 15-16).

### B.   Co-Worker Complaint against Alvarez

On July 26, 2017, while Schaible was investigating Alvarez's complaint against Persaud, another District employee — Elizabeth Rocha — complained to Schaible about Alvarez. (Doc. # 60-18 at 12; Doc. # 60-40 at 252:5-14). According to Rocha, she had trained Alvarez to perform Rocha's duties, including TD invoicing, while Rocha was on vacation. (Doc. # 60-18 at 12). When she returned from vacation, she discovered that Alvarez had failed to perform an invoicing task. (Id.; Doc. # 60-40 at 252:5-14).

According to Alvarez, in February 2017, Rocha advised Persaud of her plans to travel out of the country during the summer. (Doc. # 60-42 at 4 – 5; Doc. # 60-40 at 240:21-242:9). Persaud approved the requested vacation and directed Rocha to coordinate with Alvarez to assist Rocha while on vacation. (Doc. # 60-42 at 4). Rocha forwarded Persaud's approval of vacation and direction to coordinate to Alvarez; Alvarez acknowledged receipt and her understanding of Persaud's directive. (Id. at 1-3; Doc. # 60-40 at 243:12-16). Rocha and Alvarez met in order for Rocha to train Alvarez to perform Rocha's duties while on vacation. (Doc. # 60-40 at 244:13-245:6). On June 1, 2017, Rocha wrote directly to Persaud and Alvarez and copied others, reminding them of her vacation plans and offering them "a refresher on [her] tasks . . . in order to ensure [her] functions [would be] covered." (Id. at 248:19-250:3; Doc. # 60-43 at 1). Alvarez did not contact Rocha in response to that offer. (Doc. # 60-43 at 1; Doc. # 60-40 at 249:24-250:1).

Alvarez admitted she did not perform the invoicing, but she alleges that Rocha lied about training her with respect to invoicing. (Doc. # 60-40 at 253:6-254:19; Doc. # 66-20 at 17; Doc. # 60-18 at 13). Nevertheless, during the investigation, Alvarez stated she understood she was to

"support TD 100%" but perceived Persaud's email questioning her travel to Bartow to be an instruction to discontinue that support. (Doc. # 60-18 at 13). Schaible ultimately found Alvarez's interpretation of Persaud's email contradicted Persaud's actual statements. (Id. at 2).

Schaible's investigation confirmed Rocha's complaint against Alvarez regarding her failure to perform Rocha's invoicing function during her vacation. (Id.). Thus, Schaible recommended that Alvarez be issued corrective action for failing to meet performance expectations. (Id. at 3). On August 7, 2017, Alvarez was issued a "Counseling Statement (Written Warning)" with respect to this failure of performance. (Doc. # 60-44; Doc. # 60-40 at 257:5-11). This written warning was the only discipline issued to Alvarez during her employment and was not accompanied by any other loss or benefit of employment such as title change or reduced pay. (Doc. # 60-40 at 260:25-261:9).

### C.   Other Issues During Alvarez's Employment

After Alvarez made her complaint about Persaud, she still experienced unpleasant work circumstances. She alleges Phillips denied her a promised raise, and Persaud excluded her from a grant meeting on September 20, 2017, excluded her from unidentified staff meetings, micromanaged her work

14

through her supervisor, glared at her, and paced the sidewalk when she arrived to and left from work. (Doc. # 60-67 at 23-25, 28; Doc. # 60-40 at 344:16-345:4; Doc. # 66-20 at 19). As a result of her working environment both before and after she complained about Persaud, Alvarez "was often so anxious and upset at work that [she] became physically ill." (Doc. # 66-20 at 8). Alvarez testified that she was fearful that Persaud or Schaible would attack her. (Doc. # 60-40 at 343:12-344:24, 345:5-22).

As mentioned above, Alvarez felt that she was denied a promised raise by Phillips. (Doc. # 29 at 6; Doc. # 60-67 at 28). Alvarez maintains that she first requested a raise in September 2016. (Doc. # 60-67 at 28). According to Alvarez, Phillips told her she would receive a raise the following year. (Id.). Subsequently, she requested a raise approximately six weeks prior to being "forced to resign." (Id.). Phillips eventually told her she would receive a raise in September 2017. (Id.). Phillips effectuated Alvarez's raise on October 1, 2017, at which time her salary was increased by 2.25%. (Doc. # 60-5 at ¶ 11). Alvarez received the same increase as most of her male coworkers.

One exception was Rodney Wetzel, who received a $6,000.00 raise. (Doc. # 60-67 at 14). Wetzel was senior

planner for the District, a position which Phillips considered critical to the District's specialized grants program. (Doc. # 60-3 at ¶ 10). In August 2018, long after Alvarez's employment with the District ended, Wetzel advised Phillips of his intent to accept a job with a different agency. (Id. at ¶ 9). Phillips was vested with authority to raise Wetzel's salary within the position's prescribed wage range. (Id. at ¶ 11). Phillips exercised his discretion to do so in order maintain Wetzel's employment at the District. (Id.). Phillips has not made similar adjustments to any other employee's wages, male or female, during Alvarez's tenure with the District. (Id. at ¶ 12).

With respect to Persaud's alleged exclusion of Alvarez from a grant meeting on September 20, 2017, and additional staff meetings, Persaud's executive assistant, Debbie Moore, was responsible for sending out "'evites' to an email distribution list labeled 'Finance Group.'" (Doc. # 60-6 at 1). "This was the process by which [] Persaud's finance staff was invited to staff and grant meetings." (Id.). Alvarez's "email address was included in the Finance Group distribution list." (Id. at 2).

Moore averred that she "never removed [] Alvarez's email address from the Finance Group distribution list." (Id.).

16

Moore was "never instructed or ordered to exclude [] Alvarez from any finance or grant meetings." (Id.). In fact, in September 2017, Persaud noticed Alvarez failed to attend a staff meeting and inquired whether Moore knew why she was absent. (Id.). Moore checked the Finance Group distribution list and "Alvarez's address was still on the list." (Id.).

Regarding Persaud's conduct of directing Carter to micromanage Alvarez, glaring at her, and pacing the sidewalk when Alvarez arrived to and left from work, Persaud denies the allegations. (Doc. # 60-2 at 2).

In her affidavit, Alvarez averred that the District's "chain of command treated male employees and younger employees with significantly more respect than older females." (Doc. # 66-20 at 3). She alleges that Persaud and Phillips both "allowed male employees and younger females," including "Rodney Wetzel and Joe Chaney, as well as Debbie Moore, Marci Harrison, Kelly Sauzo, Lisa Harris, Julie Jencks, and Daisy Manjarres," "more freedom." (Id. at 3-4). These individuals were "allowed to have a more flexible schedule and their attendance and whereabouts were not scrutinized." (Id. at 4). Additionally, Persaud "made derogatory and sexual comments about women, specifically about Debbie Moore's backside and breasts." (Id.).

17

Alvarez also averred that she experienced "hostilities related to [her] age." (Doc. # 66-20 at 4). To support this assertion, she points to the comment during her job interview that she had the experience needed for the position. (Id.). Additionally, Marci Harrison, an HR employee for the District, commented that she was "shocked that [Alvarez] was able to run as much as [she did] 'at [her] age'" and that Alvarez "looked pretty good for [her] age and was thin for [her] age." (Id.).

### D.   Request for FMLA Leave

Alvarez avers she put a completed request for FMLA leave in Schaible's mailbox on September 7, 2017. (Doc. # 66-20 at 24). Schaible denied receiving the request. (Id.).

On September 18, 2017, Alvarez advised Schaible of her desire to use FMLA-provided sick leave based on anxiety. (Doc. # 60-62 at 1; Doc. # 60-40 at 355:9–16; Doc. # 60-53 at 1). On the same day, Schaible provided Alvarez with a Department of Labor, Certification of Health Care Provider form (physician's certification) and explained her responsibility to have her physician fill it out in order to be approved for FMLA leave. (Doc. # 60-53). A few days later, on September 22, 2017, Schaible notified Alvarez that she was eligible for FMLA leave. (Doc. # 60-54 at 1-3; Doc. # 60-5 at ¶ 9).

18

Alvarez understood that her "[f]ailure to provide a complete and sufficient medical certification [could] result in a denial of [her] FMLA request." (Doc. # 60-51 at 1; Doc. # 60-40 at 295:8-296:20).

Alvarez submitted to Schaible a physician's certification that her physician, Dr. Haggerty, had filled out. (Doc. # 60-51; Doc. # 60-40 at 294:4-24, 298:8-14). But the certification lacked contact information for the health care provider, provided a vague description of the job functions Alvarez was unable to perform, and insufficiently indicated the estimated time of leave. (Doc. # 60-51). Specifically, the certification stated that Alvarez was unable to perform functions "that require concentration or close work with certain other employees," and "needs to remove from toxic environment temporarily." (Id. at 2-3). When asked to "estimate the beginning and ending dates for the period of incapacity," the doctor wrote "1 day at a time." (Id. at 3). The certification also stated that Alvarez had been to another health care provider for evaluation or treatment, but it did not "state the nature of such treatments and expected duration of treatment." (Id. at 2).

On September 27, 2017, Schaible advised Alvarez of these deficiencies and described the specific additional

19

information required "in order to determine [her] FMLA status." (Doc. # 60-55; Doc. # 60-5 at ¶ 10).

According to Alvarez, she "submitted even more FMLA paperwork on September 28, 2017." (Doc. # 66-20 at 25). She also advised Schaible on October 1, 2017, that her "doctor does not understand why he would not accept the documents" she had previously provided. (Id.). The record contains a medical certification form — the original certification Alvarez provided to the District, but with additional information filled in. (Doc. # 60-56). It is unclear when Alvarez turned this amended certification in to the District and the amended certification does not state the date the additional information was added. (Id.).

The amended certification stated that Alvarez was not actually referred to another health care provider for evaluation or treatment. (Id. at 2). Regarding the job functions Alvarez could not perform, the amended certification added the words "all current job functions" after the previous description "ones that require concentration or close work with certain other employees." (Id.). But the amended certification did not add all the required additional information. For example, Schaible explained in response to the original certification that the

20

doctor needed to "specify the estimated beginning and ending dates for the period of incapacity." (Doc. # 60-55 at 2). Yet, the amended certification did not provide this information; instead, the original certification's answer — "1 day at a time" — remains. (Doc. # 60-56 at 3).

On October 13, 2017, Schaible sent Alvarez a letter, stating that she had not submitted an amended physician's certification and instructing her to submit an amended certification by October 20, 2017. (Doc. # 60-61; Doc. # 60-40 at 350:19–351:4). The letter said, in relevant part,

> We are confused by your intentions. We are giving you an extension but if we do not receive information requested in the Notice of Eligibility and Rights and Responsibilities (that we asked for on September 28th) by close of business on October 20, 2017, we will [have] no other option than to treat your time off unexcused absences under our normal time and attendance policies and, unfortunately, your position may need to be permanently replaced at that time.

(Doc. # 60-61 at 2). Schaible reiterated the same information in an October 13, 2017, email to Alvarez. (Doc. # 60-62 at 2). However, that email stated that, if Alvarez failed to provide a sufficient medical certification by October 20, the District "will permanently replace [her] position." (Id.).

On October 14, 2017, Alvarez responded to Schaible's correspondence advising him that her doctor was processing

the FMLA paperwork. (Doc. # 60-62 at 1-2; Doc. # 60-40 at 356:17-20, 357:17-23). She also expressed her intent to return to the District following the exhaustion of her FMLA leave. (Doc. # 60-40 at 358:23-359:10).

Despite this, Alvarez failed to provide an amended physician's certification to the District. (Doc. # 60-64; Doc. # 60-40 at 369:6-24). Further, Alvarez failed to return to work after September 28, 2017. (Doc. # 60-64) Therefore, Citrus Connection discharged her on December 26, 2017, for job abandonment. (Id.). Alvarez, who was over sixty years old at this time, was replaced by Sholpan Grover, a "substantially younger [woman] . . . approximately [forty] years old." (Doc. # 66-20 at 1, 27).

### E.   **Procedural History**

Alvarez initiated this action in state court, and the District removed the case to this Court on April 30, 2019. (Doc. # 1). Alvarez filed the second amended complaint — the operative complaint — on July 11, 2019. (Doc. # 29). The second amended complaint asserts numerous counts: gender-based disparate treatment in violation of Title VII (Count I); gender-based disparate treatment in violation of the Florida Civil Rights Act (FCRA) (Count II); age-based disparate treatment in violation of the Age Discrimination in

22

Employment Act (ADEA) (Count III); age-based disparate treatment in violation of the FCRA (Count IV); constructive discharge under Title VII (Count V); constructive discharge under the ADEA (Count VI); constructive discharge under the FCRA (Count VII); retaliation in violation of Title VII (Count VIII); retaliation in violation of the ADEA (Count IX); retaliation in violation of the FCRA (Count X); Family and Medical Leave Act (FMLA) interference (Count XI); and retaliation in violation of the FMLA (Count XII). (Id.).

After the Court denied the District's motion to dismiss (Doc. # 36), the District filed its answer. (Doc. # 37). The case proceeded through discovery. Now, the District seeks summary judgment on all claims. (Doc. # 60). The Motion is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344

F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III.  **<u>Analysis</u>**

The District seeks summary judgment on all counts.

### A.    **<u>Attempt to Raise Hostile Work Environment Claims</u>**

The Court begins by addressing Alvarez's improper attempt to raise claims premised on a hostile work environment theory. In her response to the Motion for Summary Judgment, Alvarez asserts that she has a hostile work environment claim under Title VII, as well as a claim for a "retaliatory hostile work environment." (Doc. # 65 at 28-29, 31).

The problem is that Alvarez previously represented to this Court that she was not premising any of her claims on a hostile work environment theory. Indeed, in her August 21, 2019, response to the District's motion to dismiss the second

amended complaint, Alvarez wrote that "she is not bringing hostile work environment claims," thereby rendering moot the District's arguments concerning hostile work environment. (Doc. # 35 at 17-18). Alvarez also wrote: "'Plaintiff is not bringing a hostile work environment claim.' To the extent that Defendant still chooses to infer one from its reading of the [s]econd [a]mended [c]omplaint, such a claim is here withdrawn." (Id. at 5). Finally, she "[r]epeat[ed] that she here is not bringing a hostile work environment claim." (Id. at 6).

The Court took these unequivocal statements seriously. Thus, in the Order denying the motion to dismiss the second amended complaint, the Court wrote: "Alvarez clarifies that she is not bringing a claim for hostile work environment under any statute. Therefore, no separate counts for hostile work environment were required." (Doc. # 36 at 8). The Court held that the District's arguments regarding the hostile work environment theory in relation to the discrimination claims were "unnecessary" because "Alvarez states in her response that she is not bringing these — or any — claims under the hostile work environment theory." (Id. at 13). Regarding the retaliation claims, the Court again relied on Alvarez's

representation that she was not proceeding under the hostile

work environment theory:

> the District's argument for dismissal is primarily
> that Alvarez has failed to specify whether she is
> proceeding on these [retaliation] claims under a
> hostile work environment theory or otherwise. But,
> again, Alvarez has clarified that she is not
> bringing any claims under a hostile work
> environment theory. The District's concern over
> this issue is thus moot.

(Id. at 16).

Despite her previous representations to the Court, which

the Court relied on in determining whether the second amended

complaint was subject to dismissal, Alvarez now attempts to

rely on the hostile work environment theory for both her

gender discrimination and retaliation claims.

Not only is such conduct impermissible, it is

potentially sanctionable. However, the Court will give

Alvarez's experienced counsel the benefit of the doubt and

merely ignore her arguments regarding hostile work

environment, which she had so vehemently waived earlier in

this litigation. Alvarez's arguments concerning hostile work

environment are estopped.

**B.**    **Title VII and FCRA Gender Discrimination**[1]

In Counts I and II, Alvarez asserts claims for gender discrimination in violation of Title VII and the FCRA. (Doc. # 29 at 8-11).

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish his Title VII claim with either direct or circumstantial evidence of discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)(citing Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999)). Alvarez relies on circumstantial evidence to establish her claim.

In analyzing allegations of single-motive discrimination supported by circumstantial evidence, the Court often — but not exclusively — follows the burden-shifting framework

---

[1] "The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Indeed, "[n]o Florida court has interpreted the Florida statute to impose substantive liability where Title VII does not." Id. Thus, the Court can address both claims with the same analysis.

established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Marcelin v. Eckerd Corp. of Fla., No. 8:04-cv-491-T-17MAP, 2006 WL 923745, at *4 (M.D. Fla. Apr. 10, 2006)(citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)). Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006).

To establish a prima facie case of disparate treatment under the McDonnell Douglas framework, Alvarez must demonstrate that she: "(1) belongs to a protected class; (2) suffered an adverse employment action; (3) was qualified to do [her] job; and (4) was treated less favorably than similarly situated employees outside of the protected class." Martin v. Rumsfeld, 137 F. App'x 324, 325 (11th Cir. 2005).

The District challenges the second and fourth elements of Alvarez's gender discrimination claims under McDonnell Douglas — the adverse employment action and comparator elements. (Doc. # 60 at 20).

29

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000)(citation and internal quotation marks omitted). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239. "If an action has no effect on an employee, it is not an adverse employment action." Clark v. Potter, 232 F. App'x 895, 896 (11th Cir. 2007).

The District summarizes the alleged adverse employment actions identified by Alvarez in her operative complaint:

> Persaud sending her emails which offended her and which included coworkers on the distribution; Persaud making disrespectful statements to her

during staff and finance meetings; Persaud
excluding her from a staff meeting; Persaud glaring
at her and pacing the sidewalk when she arrived and
left work; coworker, Rocha complaining that she
failed to perform Rocha's duties while on vacation;
supervisor, Carter issuing a written warning for
failing to cover for Rocha; Carter micromanaging
her; Schaible's aggressive demands for her to
attend interviews and produce documents supporting
her complaints against Persaud; Schaible requiring
additional information with respect to the
physician's certification; and Phillips denying her
a raise.

(Doc. # 60 at 21).

But, in her response, Alvarez only raises two adverse
employment actions — her alleged termination and her alleged
constructive discharge. (Doc. # 65 at 24-25). Thus, Alvarez
has abandoned any other potential adverse employment action
as the basis of her discrimination claims. See Gossard v. JP
Morgan Chase & Co., 612 F. Supp. 2d 1242, 1249 (S.D. Fla.
2009)("In her Response to the instant Motion, termination is
the only adverse employment action of which Plaintiff
complains for her discrimination claims. Thus, she has waived
all other allegations of adverse employment actions for her
discrimination claims."), aff'd, 389 F. App'x 936 (11th Cir.
2010).

As discussed in greater depth in Section F, infra,
Alvarez cannot establish her claims for constructive
discharge. Thus, she cannot proceed on the basis that the

adverse employment action she faced was her constructive discharge. Regarding her allegation of termination, the October 13, 2017, letter from Schaible did not terminate Alvarez's employment. (Doc. # 60-61). Rather, that document indicates that Alvarez's employment would be terminated if she failed to provide the additional required FMLA certification by October 20, 2017. (Id.). When Alvarez failed to provide the necessary medical paperwork or return to work, her employment was eventually terminated in December 2017 for job abandonment. (Doc. # 60-64). Still, because the District did eventually terminate her employment, the termination in December 2017 does qualify as an adverse employment action.

The District argues that Alvarez cannot present any comparators who did not face adverse employment actions for engaging in similar conduct as Alvarez. (Doc. # 60 at 24). Indeed, Alvarez does not point to comparators in her response. (Doc. # 65 at 26-27).

Rather, Alvarez emphasizes that she does not need to present comparators because the Eleventh Circuit has announced another method of establishing a prima facie case of discrimination besides the McDonnell Douglas framework. (Id.). On this point, Alvarez is correct. While the District

takes a dim view of the "convincing mosaic" case law, such precedent is binding on the Court.

Alvarez "may establish a 'convincing mosaic' [of discrimination] with 'evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.'" Melvin v. Fed. Express Corp., No. 19-11872, 2020 WL 2568376, at *3 (11th Cir. May 21, 2020)(quoting Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Regarding pretext, "[a] plaintiff may create an inference of discriminatory intent 'by showing that [the employer's] proffered reasons are not credible.'" Melvin, 2020 WL 2568376, at *5 (quoting Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010)). "To show than an employer's reason is not credible, the plaintiff 'must meet that reason head on and rebut it,' demonstrating 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale.'" Id. (citations omitted). "But plaintiffs may not recast the reason or merely quarrel with its wisdom." Id. "It

33

is not [the Court's] role to second-guess the business decisions of employers." Id.

Alvarez argues she has presented a "convincing mosaic" of circumstantial evidence of gender discrimination. According to her:

> The workplace was so permeated with discriminatory animus that several witnesses were able to testify about it with specificity. Ms. Mauras stated that [] Persaud treated Plaintiff "brutally" during the meetings he did not exclude her from, and that his conduct was based on her gender. Many have testified that [] Persaud would never treat a male employee the way he treated [Alvarez].

(Doc. # 65 at 27).

The Court disagrees with Alvarez that the evidence before the Court is sufficient to create a triable issue of the District's alleged discriminatory intent. Here, there is no dispute that Persaud occasionally spoke to Alvarez in a harsh manner, but there is not sufficient evidence to suggest Alvarez's termination was actually based on her gender. When Alvarez complained to HR about Persaud, the District investigated her allegations. Although Alvarez disapproved of Schaible's methods and demeanor and the District concluded that Persaud did not discriminate against Alvarez, it did conclude that Persaud was disrespectful in his emails and disciplined him accordingly. The generalized allegations that

Persaud spoke harshly to other female employees, but rarely to male employees, are not sufficient to raise an inference of unlawful discrimination.

More importantly, there is not sufficient evidence that the District's reason for ultimately terminating Alvarez's employment was pretextual. Regarding pretext for her termination, Alvarez argues:

> [Alvarez] became so ill that she visited her physician and completed the necessary paperwork to secure FMLA leave. [] Schaible denied ever receiving those documents, so she provided them a second time. Although she was told she was eligible, [] Schaible then sent her on an impossible mission to secure additional information from her physicians to justify her obvious need for leave. Although she made additional appointments and attempted to appease [] Schaible, her physician was unable to provide whatever information it was he claimed he needed.

(Doc. # 65 at 35). Thus, Alvarez argues that she has rebutted the District's legitimate, non-discriminatory reason by focusing on Alvarez's first request for FMLA leave that Schaible denied receiving and asserting that Schaible's request for additional medical certification was unjustified.

But the record is clear that Alvarez never turned over sufficient medical documentation to support her request for FMLA leave. Schaible provided a line-by-line explanation of the deficiencies of the original medical certification and

what additional information was required. (Doc. # 60-55). Although there is an undated amended certification in the record, that certification still did not provide all the information Schaible requested. (Doc. # 60-56). For example, Schaible explained in response to the original certification that the doctor needed to "specify the estimated beginning and ending dates for the period of incapacity." (Doc. # 60-55 at 2). Yet, the amended certification did not provide this information; instead, the original certification's answer — "1 day at a time" — remains. (Doc. # 60-56 at 3). Thus, there is no genuine dispute of material fact as to whether the amended certification was sufficient to satisfy her burden to provide a needed medical certification.

The October 13 letter then extended the deadline for Alvarez to provide a sufficient certification, and Alvarez responded that her doctor was processing the FMLA paperwork. (Doc. # 60-62 at 1-2). Yet, despite her representation, Alvarez did not provide a further medical certification. Thus, the District ended Alvarez's employment based on Alvarez's failure to either support her request for FMLA leave or return to work. Alvarez has not rebutted this.

In short, Alvarez has not established a "convincing mosaic" of circumstantial evidence of discrimination. Thus,

summary judgment is granted on the claims for gender discrimination under Title VII and the FCRA.

### C.   **ADEA and FCRA Age Discrimination**[2]

In Count III, Alvarez asserts a claim for age discrimination in violation of the ADEA. (Doc. # 29 at 11-13). Similarly, in Count IV, she pleads a claim for age discrimination in violation of the FCRA. (Id. at 13-14).

"The ADEA prohibits employers from firing employees who are forty years or older because of their age." Liebman v. Metro. Life Ins. Co., 808 F.3d 1294, 1298 (11th Cir. 2015). "To assert an action under the ADEA, an employee must establish that his age was the 'but-for' cause of the adverse employment action." Id. "This showing can be made through either direct or circumstantial evidence." Id.

When a plaintiff relies on circumstantial evidence, as Alvarez does here, the McDonnell Douglas framework may apply. Id. "To make a prima facie case of age discrimination, the employee must show: (1) [she] was a member of the protected group between the age of forty and seventy; (2) [she] was subject to an adverse employment action; (3) a substantially

---

[2] "Disability and age-related discrimination actions under the FCRA are analyzed under the same framework[] as the [] ADEA." Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1266 (11th Cir. 2014).

younger person filled the position from which [she] was discharged; and (4) [she] was qualified to do the job from which [she] was discharged." Id.

The District argues that — for the same reasons argued regarding the gender discrimination claims — Alvarez "cannot demonstrate that she was subject to an adverse employment action or that she was constructively discharged." (Doc. # 60 at 28). Even if a prima facie case under the McDonnell Douglas framework is established, the District again argues it has already raised a legitimate non-discriminatory reason for its actions and that Alvarez cannot establish pretext. (Id.).

Alvarez asserts that she has established a prima facie case of age discrimination. (Doc. # 65 at 27-28). She notes that she was over sixty years old at the time her employment ended, and she was replaced by a younger woman. (Id. at 28; Doc. # 66-20 at 1, 27). She insists there is "considerable testimony that [] Persaud favored younger employees, and treated them more favorably," such as when Mr. Wetzel received a raise. (Id. at 28).

Even assuming Alvarez has met her prima facie case, she has not rebutted the District's non-discriminatory reason for ending her employment for the reasons explained in the previous section. Alvarez has not shown that the District's

explanation that Alvarez never provided a sufficient medical certification for FMLA leave lacks credibility. Thus, summary judgment is granted on these claims.

### D.   Title VII and FCRA Retaliation

In Counts VIII and X, Alvarez pleads claims for retaliation in violation of Title VII and the FCRA. (Doc. # 29 at 19-20, 21-22).

The _McDonnell Douglas_ burden-shifting framework frequently applies to Title VII retaliation cases. _Jacomb v. BBVA Compass Bank_, No. 18-11536, 2019 WL 5692666, at *3 (11th Cir. Nov. 4, 2019)(citing _Brown v. Ala. Dep't of Transp._, 597 F.3d 1160, 1181 (11th Cir. 2010)). "[A] plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment action; and (3) [she] established a causal link between the protected activity and the adverse action." _Bryant v. Jones_, 575 F.3d 1281, 1307-08 (11th Cir. 2009).

However, the Eleventh Circuit has also previously applied the "convincing mosaic" standard to Title VII retaliation claims. See _Calvert v. Doe_, 648 F. App'x 925, 929 (11th Cir. 2016)("Calvert has established 'a convincing mosaic of circumstantial evidence' that would permit a jury

to infer that the county retaliated against him because of his previous lawsuit.").

Under either standard, Alvarez's claims fail because she has not presented sufficient evidence of pretext. Aside from her improper attempt to proceed on a retaliatory hostile work environment theory (Doc. # 65 at 31), Alvarez bases her retaliation claims only on her termination or her alleged constructive discharge — the same adverse employment actions she relied on for her discrimination claims. See (Id. at 30)("Defendant disputes all three elements [of the prima facie case of retaliation], but as shown above, Plaintiff experienced an adverse employment action.").[3] Again, as discussed in greater depth in Section F, *infra*, Alvarez cannot establish her claims for constructive discharge. Thus, only her termination may serve as an adverse employment action.

---

[3] The Court is aware that "[a] materially adverse action in the context of a Title VII retaliation claim includes any action that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" — a lower threshold than that for a discrimination claim. Jacomb, 2019 WL 5692666, at *3 (quoting Crawford v. Carroll, 529 F.3d 961, 973-74 (11th Cir. 2008)). Nevertheless, Alvarez has not specified any discrete materially adverse actions on which she bases her prima facie case of retaliation besides her termination or constructive discharge. (Doc. # 65 at 30). The only other adverse conduct Alvarez describes is mentioned only as support for her retaliatory hostile work environment theory, which the Court will ignore. (Id. at 31).

And while the parties debate whether Alvarez has satisfied the other elements of her prima facie case, resolution of those issues is not necessary. Just as with Alvarez's sex and age discrimination claims, Alvarez has failed to rebut the District's non-discriminatory reason for terminating her employment: her failure to provide a sufficient medical certification to support the multiple weeks of leave she took from work. Because she never provided a sufficient certification nor returned to work, Alvarez was terminated. Thus, Alvarez has not established pretext and summary judgment is granted on these claims.

**E.   ADEA Retaliation**

Alvarez also alleges that the District retaliated against her in violation of the ADEA in Count IX. (Doc. # 29 at 20-21).

ADEA "[r]etaliation claims are governed by the same burden-shifting framework described" previously. Brillinger v. City of Lake Worth, 317 F. App'x 871, 877 (11th Cir. 2008). "To establish a prima facie case of retaliation, Brillinger must show that (1) he engaged in ADEA protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." Id.

41

The District argues that summary judgment is appropriate on this claim because Alvarez "did not complain of age discrimination during her employment; her first complaint of age discrimination was her amended charge of discrimination filed the year after she stopped reporting to work." (Doc. # 60 at 28 n.30).

Alvarez failed to respond to this argument in her response. (Doc. # 65). Indeed, in the response's section on retaliation, Alvarez merely states that she "expressly referenced discrimination and her gender in relation to [] Persaud's conduct" when she complained to Schaible. (Id. at 30). While she alleges there is evidence that Persaud treated her poorly "because or her age and gender," she never argues that she actually complained about age discrimination during her employment nor addresses the District's argument that her claim fails for this reason. (Id.).

Thus, Alvarez has abandoned her ADEA retaliation claim. See Edmondson v. Bd. of Trustees of Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007)("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Powell v. Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014)("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

Summary judgment is granted on the ADEA retaliation claim.

**F.    Constructive Discharge**

In Counts V, VI, and VII, Alvarez asserts claims for constructive discharge under Title VII, the ADEA, and the FCRA. (Doc. # 29 at 14-19).

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003)(citation omitted). This is a high standard and "[o]ne's working environment does not become objectively intolerable simply

43

because it becomes less attractive." <u>Hipp v. Liberty Nat'l</u>
<u>Life Ins. Co.</u>, 252 F.3d 1208, 1231-1235 (11th Cir. 2001).

"Establishing a constructive discharge claim is a more
onerous task than establishing a hostile work environment
claim." <u>Bryant</u>, 575 F.3d at 1298. Thus, necessarily, the
conduct complained of must be "extreme [enough] to amount to
a change in the terms and conditions of employment." <u>Faragher</u>
<u>v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998). "'[S]imple
teasing,' offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes
in the 'terms and conditions of employment.'" <u>Id.</u> (citation
omitted). Constructive discharge cannot be established by the
"the ordinary tribulations of the workplace, such as the
sporadic use of abusive language." <u>Id.</u> (citation omitted).

The Court agrees with the District that the actions of
which Alvarez complains fall short of establishing
constructive discharge. (Doc. # 60 at 22-23). True, Persaud
was harsh on Alvarez in three staff meetings and at least
fourteen emails. Even after she stopped reporting directly to
him, Alvarez was disturbed by Persaud's glaring at her and
pacing outside the office around the time she left each day.
She felt as though she was excluded from meetings and
micromanaged by her new supervisor, Ms. Carter. Alvarez was

displeased with the methods the HR department took in investigating her complaint against Persaud and felt that its investigation of Ms. Rocha's complaint against Alvarez was unfair. As a result, Alvarez "was often so anxious and upset at work that [she] became physically ill." (Doc. # 66-20 at 8). She was also fearful that Persaud or Schaible would attack her. (Doc. # 60-40 at 343:12-344:24, 345:5-22).

While Alvarez no doubt considered all this conduct hurtful and anxiety-producing, this conduct was not so frequent or offensive to rise to the level of a constructive discharge. See Austin v. FL HUD Rosewood LLC, 791 F. App'x 819, 825 (11th Cir. 2019)("The comments, while undoubtedly hurtful to Austin, were not so frequent or offensive to rise to the level needed to support a claim of constructive discharge."); see also Poole v. Country Club, 129 F.3d 551, 553 (11th Cir. 1997)(holding that constructive discharge claim survived summary judgment where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"). Alvarez's subjective feelings of anxiety-induced illness and fear of Persaud and Schaible should not be considered. See Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998)("In assessing constructive discharge claims, we do not

consider a plaintiff's subjective feelings about his employer's actions.").

Simply put, taking all the evidence in the light most favorable to Alvarez, the workplace was not "objectively intolerable" such that a reasonable person would resign. Hipp, 252 F.3d at 1231-1235. Summary judgment is granted on these claims.

### G. **FMLA Interference**

In Count XI, Alvarez pleads a claim for FMLA interference. (Doc. # 29 at 22).

"To establish an FMLA interference claim an employee must demonstrate by a preponderance of the evidence that he was denied a benefit to which he was entitled." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1277 (M.D. Ala. 2014)(citing Pereda v. Brookdale Senior Living Communities, 666 F.3d 1269, 1274 (11th Cir. 2012)). "Benefits under the FMLA include both taking leave and being reinstated following a leave period, subject to certain conditions." Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017). "With respect to an employee's right to take FMLA leave, unlawful employer interference includes not only refusing to authorize FMLA leave, but also 'discouraging an employee from using such leave.'" Id. (citation omitted). "In

addition to showing interference, a plaintiff must show that she has been prejudiced by the FMLA violation in some way." Id. "An employee need not 'allege that his employer intended to deny the right; the employer's motives are irrelevant.'" Martin v. Brevard Cty. Pub. Sch., 543 F.3d 1261, 1267 (11th Cir. 2008)(quoting Strickland v. Water Works and Sewer Bd., 239 F.3d 1199, 1208 (11th Cir. 2001)).

According to the District, summary judgment is appropriate on this claim because Schaible acted in compliance with the FMLA's requirements but Alvarez herself failed to satisfy the requirement of submitting a complete and sufficient certification from her health care provider. (Doc. # 60 at 34).

When Alvarez requested FMLA leave, the District was required to notify her of her eligibility to take FMLA leave within five business days. 29 C.F.R. § 825.300(b)(1). Because she sought leave for her own serious health condition, the District could — and did — require Alvarez to support her request with a certification issued by her health care provider. 29 C.F.R. § 825.305(a), (c). If the certificate was incomplete, the District was required to explain the deficiencies to Alvarez and provide her seven days to provide a complete certification. 29 C.F.R. § 825.305(c). But if

Alvarez failed to provide a sufficient and complete certification, then the District was entitled to deny the request. Id.

While Alvarez alleges she had submitted an FMLA request to Schaible earlier, there is no dispute that Alvarez did request FMLA leave on September 18, 2017. (Doc. # 60-62 at 1; Doc. # 60-40 at 355:9-16; Doc. # 60-53 at 1). Within the required five-day period, Schaible gave Alvarez a blank certification form and notified Alvarez that she was eligible for FMLA leave. (Doc. # 60-53). Although Alvarez gave a certification to Schaible, Schaible considered the form insufficient because it included vague and confusing answers to some questions. (Doc. # 60-55). So, Schaible explained to Alvarez what additional information was required to determine whether she was eligible for FMLA. (Id.).

Although Alvarez provided an amended certification, it was still insufficient because it did not provide all the additional information Schaible requested. (Doc. # 60-56). On October 13, 2017, Schaible let Alvarez know that the District had "not received the additional information [it] needed to approve [Alvarez's] FMLA." (Doc. # 60-61). He also extended the time for Alvarez to file the revised certification. (Id.). Alvarez acknowledged the extended deadline and stated that

48

her doctor was processing the FMLA paperwork. (Doc. # 60-62 at 1-2; Doc. # 60-40 at 356:17-20, 357:17-23). Still, Alvarez did not file a sufficient certification. Although Alvarez maintains that "her physician was unable to provide whatever information it was [Schaible] claimed he needed," Alvarez does not deny that she never sent in additional paperwork in response to the October 13, 2017, letter. (Doc. # 65 at 35). Rather than terminate her employment when she missed the deadline, the District kept Alvarez's job available for her return until December 26, 2017. (Doc. # 60-64). At that point, the District terminated Alvarez's employment. (Id.).

Alvarez argues these facts still support a finding that her FMLA rights were interfered with. Here argument as to this claim is as follows:

> Here, [Alvarez] received notice from [the District] that she was entitled to FMLA leave, and [] Schaible thereafter continued to refuse to accept the forms prepared by [Alvarez]'s physician, insisting that the forms were insufficient. Eventually, he notified [Alvarez] that she was actually not entitled to FMLA leave, which supports [Alvarez]'s prima facie interference proffer.

(Doc. # 65 at 33).

Alvarez's argument is unpersuasive. The District informed Alvarez on September 22 that she was eligible for FMLA leave — not entitled to it. (Doc. # 60-53). After Alvarez

49

submitted her original medical certification, the District informed Alvarez why that certification was insufficient and gave her time to provide an amended certification. Alvarez never provided a sufficient certification. The amended certification still did not address all the issues raised by Schaible and was thus insufficient. (Doc. # 60-56). Despite Schaible's October 13 letter and Alvarez's response that her paperwork was in process, Alvarez never turned in another medical certification after that time.

Therefore, the District acted lawfully when it denied Alvarez's FMLA request. Alvarez was not denied an FMLA benefit to which she was entitled, because she never complied with the certification requirements to receive FMLA leave. Summary judgment is granted to the District on this claim.

### H.   **FMLA Retaliation**

In Count XII, Alvarez asserts a claim for FMLA retaliation, alleging Alvarez was harassed and constructively discharged for requesting FMLA leave. (Doc. # 29 at 22-23).

"FMLA retaliation is distinct from FMLA interference in that to succeed on a FMLA retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley, 54 F. Supp. 3d at

1282 (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)). "A retaliation claim, therefore, is different from an interference claim because an employee must show intent to retaliate." Id.

The McDonnell Douglas burden-shifting framework applies to FMLA retaliation claims. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). "A plaintiff bringing an FMLA retaliation claim must show that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley, 54 F. Supp. 3d at 1282. "To state a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) [she] engaged in a statutorily protected activity, (2) [she] suffered an adverse employment action, and (3) the adverse action was causally related to a protected activity." Id. "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Id.

Alvarez argues that she has met her prima facie case because she "sought FMLA leave in September 2017, and on October 13, 2017, [] Schaible notified her that her absences would be considered unexcused and her position permanently

replaced, terminating Plaintiff's employment." (Doc. # 65 at 33). Thus, Alvarez argues that the termination of her employment is the adverse employment action relevant to this claim.

She also asserts that she has established pretext. She points out that Schaible "denied ever receiving" the first set of paperwork Alvarez submitted to receive FMLA leave and "sent her on an impossible mission to secure additional information from her physicians to justify her obvious need for leave." (Doc. # 65 at 35).

This is not persuasive. Alvarez has not rebutted the reason she was terminated: she did not provide Schaible a sufficient medical certification by the October 20, 2017, deadline, nor did she ever return to work. The temporal proximity between Alvarez's request for leave in September 2017 and her termination — regardless of whether that termination occurred on December 26, 2017, or earlier on October 20, 2017, the deadline to provide the amended certification — is not sufficient by itself to establish pretext. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006)("The close temporal proximity between Hurlbert's request for leave and his termination — no more than two weeks, under the broadest

reading of the facts — is evidence of pretext, though probably insufficient to establish pretext by itself.").

Despite her claim that obtaining the additional information was "an impossible mission," Alvarez has not created a genuine issue of material fact as to whether Schaible was unreasonable for requesting the additional information for the certification. The record reflects that Alvarez did not provide Schaible an amended certification in response to his October 13 letter by the deadline set in the letter. Taking all the evidence in the light most favorable to Alvarez, Alvarez has not carried her burden of supporting her FMLA retaliation claim. Summary judgment is granted on this claim.

## IV.   Conclusion

Summary judgment is appropriate on all of Alvarez's claims. Thus, the Court grants the District's Motion.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Lakeland Area Mass Transit District's Motion for Summary Judgment (Doc. # 60) is **GRANTED.**

(2)   The Clerk is directed to enter judgment in favor of Defendant Lakeland Area Mass Transit District and

against Plaintiff Brenda Alvarez on all claims of the second amended complaint.

(3)   Thereafter, the Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 25th day of June, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE